**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL No. 17-62** |
| | : | |
| **RAHEEM PLEASANT** | : | |

**MCHUGH, J.**                                                          **November 1, 2017**

## MEMORANDUM

Defendant Raheem Pleasant stands accused of taking part in four robberies. He was arrested following an investigation that involved a number of law enforcement techniques. Several pretrial motions have been filed, and following briefing, a full evidentiary hearing was held, rendering the motions now ripe for resolution.

### 1) Defendant's Motion to Suppress Physical Evidence

Defendant Pleasant seeks to suppress physical evidence found in his car—a fake gun, two ski masks, and plastic bags—because he believes his arrest and the subsequent search of his car violated his Fourth Amendment right to be free from unreasonable search and seizure.

Following a bank robbery that occurred on January 2, 2017, police reviewed the security camera footage from the bank and nearby businesses. As a result of that review, they were able to identify a burgundy sedan with two missing hub caps. In addition to the missing hubcaps, the vehicle had a rear spoiler, tinted windows, two window visors, and a prominent Chevrolet Impala logo on the side pillar. A Philadelphia police detective assigned to the Violent Crimes Task Force pondered the suspects' likely route of travel and, following his intuition, continued to gather footage from available surveillance cameras to trace its path. On one recording, the detective observed an item being thrown from the suspect vehicle that visually appeared to have

fluttered to the ground. Upon site inspection he recovered a black scarf. Later, approximately one block away, the detective recovered two black gloves along the car's route of travel.

A description of the car was broadcast, and on January 10, 2017, Philadelphia police officers located the vehicle parked approximately five miles from the site of the robbery. The license plate was communicated to the case investigators, who determined through records that it was owned by Defendant Raheem Pleasant. They then compared surveillance photographs from the bank with the Pennsylvania Bureau of Motor Vehicle photo for Mr. Pleasant, as well as with photos in a law enforcement database, and positively identified him as one of the two bank robbers. In the bank surveillance photographs, one of the robbers can be shown to be wearing a black scarf, partially covering his face with it, and two black gloves.

The FBI agent assigned to the case, Special Agent Percy Giles, proceeded to the scene where the car was parked. When Mr. Pleasant returned to the vehicle he was asked to accompany the agent to the FBI offices in Philadelphia. The Government does not dispute that this constituted an arrest. As the FBI was questioning Mr. Pleasant, officers from Upper Darby Township in Delaware County presented an arrest warrant in connection with one of the other open bank robbery cases, and Defendant was remanded into their custody. That same day, Philadelphia police were instructed to impound the vehicle. Also on January 10, Mr. Pleasant's girlfriend was shown photographs from the bank surveillance camera, and positively identified him as one of the robbers. The Government secured a federal arrest warrant on January 12, 2017, secured a warrant to search the car on January 17, and ultimately conducted the search on January 18, finding ski masks, a fake firearm that was consistent in appearance with the handgun seen on the bank surveillance video and as described by witnesses, and crumpled plastic bags similar to ones used in the robberies.

On these facts, I have a little hesitation in denying the Motion to Suppress. Thoughtful and diligent police work making use of surveillance cameras provided investigators with a clear description of the vehicle. When Philadelphia police located the vehicle, a comparison of available photographs of Mr. Pleasant provided convincing evidence that he was one of the two robbers. For probable cause to exist, there need only be a "fair probability that the person committed the crime at issue" and the standard is met when the "facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been committed by the person to be arrested." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000); *see also United States v. Edwards*, No. CRIM. 11-735, 2013 WL 2256125, at *12 (E.D. Pa. May 23, 2013), *aff'd*, 591 F. App'x 156 (3d Cir. 2014) (finding probable cause on similar facts).

This leaves the question whether police had a reasonable basis upon which to seize Defendant's car. *Florida v. White,* 526 US. 559 (1999), is the controlling case. There, the Supreme Court held that the police have authority to seize a vehicle from a public street if they have a reasonable belief that the vehicle "may have been used at some point in the past to assist in illegal activity." *Id.* at 567. The Court held that a lesser standard was applicable because police activities such as towing a vehicle which is parked in a public street does "not involve any invasion of [the owner's] privacy." *Id*. at 566. The Court further noted that seizure of a vehicle can be required because of the nature of automobiles—their inherent mobility creates a risk that evidence can be lost. Law enforcement concern over possible loss of evidence is underscored by the facts of this case, because the defendant sought to have a family member tow the car after he was arrested.

Arguably, the police could have searched the vehicle without securing a warrant, because

the United States Supreme Court has given the automobile exception an expansive interpretation. *United States v. Donahue,* 764 F. 3d 293, 295 (3d Cir. 2014). Here, however, the agents took the additional precaution of securing a warrant before searching the vehicle. Eight days elapsed from the time the vehicle was seized to the time it was searched, and the defense argues that in some way this undermined the existence of probable cause. With the vehicle impounded the evidence was secure. Furthermore, the investigators continued to accumulate more evidence, making the case for searching the vehicle that much stronger. In the context of a warrantless search of a seized vehicle, the Third Circuit has held that a delay of five days was "immaterial," *Donovan*, 764 F.3d at 300, and cited with approval one case approving a warrantless search 38 days after impound, *United States v. Gastiaburo*, 16 F.3d 582 (4th Cir. 1994), and another upholding a search seven days after seizure, *United States v. McHugh*, 769 F.2d 860 (1st Cir. 1985). *See also United States v. Jones,* 994 F.2d 1051 (3d Cir. 1983) (passage of two weeks between the time of the robbery and time of the search was not so long as to undermine probability that perpetrators would still have possession of the robbery proceeds).

In that regard, authorities here were investigating an ongoing *series* of bank robberies, supporting an inference that the defendant would likely still possess the handgun displayed at the various banks or other instrumentalities it used to carry out the crimes. Once again, the record shows that such an inference is supportable, because the FBI did in fact recover the firearm, bags, and masks that appear to have been used by the robbers. Finally, it bears emphasis that ultimately the search was conducted pursuant to a warrant that was based upon a detailed affidavit of probable cause. The agents performing the search were entitled to rely on the presumed validity of the warrant. *United States v. Williams,* 3 F.3d 69 (3d Cir. 1993). For these reasons, the Motion to Suppress Physical Evidence will be denied.

## 2) __Defendant's Motion to Suppress Out-of-Court Identifications__

Several witnesses to the bank robberies have viewed photo arrays and identified Defendant Pleasant as one of the bank robbers. Defendant now argues that those identifications violated his constitutional right to due process and, as a result, the government should not be allowed to present evidence of those out-of-court identifications.

In evaluating the admissibility of out-of-court identifications, the standard is one of fairness under the Due Process Clause of the 14th Amendment. *Manson v. Braithwaite*, 432 U.S. 98, 113 (1977). Within the Third Circuit, the standard is applied by using a two-step process. The court must first inquire as to whether the identification procedure was "unnecessarily suggestive," and if so, further determine whether it "creates a substantial risk of misidentification." *United States v. Brownlee*, 454 F. 3d 131, 137 (3d Cir. 2006). The defendant bears the burden of proving that the procedure for identification used was impermissibly suggestive. *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003). "The suggestiveness of a photographic array depends on several factors, including the size of the array, its manner of presentation, and its contents. If there is no prejudice in the manner of presentation, the primary question is whether the suspect's picture is so different from the rest that it suggests culpability." *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991); *see also Lawrence,* 349 F.3d at 115 (explaining that an array is suggestive "when the circumstances surrounding [it] unduly suggest who an identifying witness should select.").

In investigating the four bank robberies with which Defendant stands charged, law enforcement used three photo arrays, with multiple viewings. Law enforcement authorities from Delaware County presented a simultaneous array of the images to a teller from the robbery that occurred on December 17, 2016. The Federal Bureau of Investigation used two sequential arrays

consisting of six photographs each.  In the last showing of one of the sequential arrays, which took place in March 2017, a more recent photograph of the defendant was substituted.

On January 10, 2017, the simultaneous array was shown to the teller confronted during the December 17 robbery, and the Defendant was identified as the robber.  Also on January 10, 2017, the FBI showed the first sequential array to one of the victims of January 2, 2017 robbery, the teller confronted by the robbers, and that victim identified the defendant with 40 percent certainty.  The next day, a nearby teller who witnessed the crime viewed the same array, and identified the defendant with 100 percent certainty.  The same array was shown on January 11, 2017, to two of the witnesses from the December 23, 2016 robbery.  Both were bank employees, but neither was the teller involved.  One identified the defendant with 100 percent certainty, and the other identified him with 60 percent certainty.  Finally, the FBI showed a different sequential array, which included a more recent photograph of Defendant, to the victims of the September 15, 2016 robbery.  The teller confronted was unable to make an identification.  Without any changes to the array, it was then shown to a nearby bank employee, who chose the Defendant.  It should be noted that this final array represented the largest lapse of time, approximately six months between the robbery and the identification.

The witnesses the Government presented at the suppression hearing were not in a position to describe how the images were chosen for the simultaneous array used by Upper Darby police. With respect to the sequential arrays used by the FBI, computer software was used to choose the images based upon the composite descriptions provided by eyewitnesses.  In this instance, the parameters included, among other things, a "flat nose" and a particular configuration of facial hair (a goatee).  It should be noted that although the initial sampling for comparators is done by computer, at the end of the process an agent for the Government makes

the final selection of the images. The instructions given to the witnesses who reviewed the arrays are set forth in the companying reports. For purposes of review, the Court has both printed the images for review, and further reviewed full-color images as docketed on ECF.

Upon review of the photographs here I conclude that all of them depict individuals who fit the general physical description of the suspect provided by witnesses. The facial shapes and general features of the men pictured are similar as are the shape of their noses and configurations of facial hair. It is of course impossible to generate images that completely mirror the physical attributes of any given suspect, but the images employed here have substantial similarity. The defense complains of differences in the complexion of the individuals in the arrays, but I do not find such differences to be striking, and in the case of the eight-photo simultaneous array, the complexion of all of the individuals is similar. The defense also points to specific characteristics of some of the individuals in the sequential arrays, such as acne scars or other facial marking. Once again, based upon my review, I did not find any such characteristics so prominent as to render use of the photo unfair. At the hearing, although Defendant did not testify, it was represented that in two of the arrays, he was wearing a prison jump suit (having had his picture taken before release from custody). I will accept that representation as true. However, contrary to counsel's characterization of the photograph, it does not appear that Mr. Pleasant was wearing a "bright orange jumpsuit." Rather, in the photograph he appears to be wearing a pale red shirt. As one who has visited multiple correctional institutions in a variety of capacities, and seen many varieties of prison uniforms, until defense counsel made such an offer of proof, it was in no way apparent to me where Mr. Pleasant had been photographed. I do not see a risk that any of the witnesses would have been influenced.

As to overall fairness, the Government makes a telling point. The fact that one witness, a

teller who was personally victimized, was utterly unable to make a positive identification, combined with the fact that two other witnesses identified the defendant with less than 100 percent certainty, strongly suggests that the arrays were not unduly suggestive. It is also noteworthy that two different methodologies were employed, with one array showing the photographs simultaneously, and the others sequentially.

Even if I were to conclude that the lineup was unduly suggestive, the identifications by the witnesses would nonetheless be admissible if they are reliable under the totality of the circumstances. The controlling test is established by *Neil v. Biggers,* 409 U.S. 188, 199–200 (1972). Turning first to the opportunity of the witnesses to observe the defendant at the time of the crime, three of the tellers who were in close proximity were able to identify him, albeit with varying levels of certainty. Three other bank employees had unobstructed views from several feet away—they also identified the defendant. In each instance the bank robbed was brightly lit. *See United States v. Clark*, 989 F.2d 1490, 1495–96 (7th Cir. 1993) (collecting cases). There can be little question but that the witnesses' attention would have been focused at the time, as each witness was aware that a robbery was in the progress. The physical descriptions were not uniform, but there was enough consistency to suggest that the witnesses observed and processed relevant identifying information. The level of certainty on the part of the witnesses varied, with four expressing no doubt that Mr. Pleasant was the perpetrator. As noted above, the inability of one witness, and the uncertainty of another, is paradoxically reassuring as to whether the photo arrays were unduly suggestive. Finally, with the exception of one array, all of the identifications took place less than a month after the robberies, and in the case of the January 2, 2017 robbery, within about a week. The longest the interval between the robbery and identification involved the September 15, 2016 robbery, when the sole witness to view a photo array did so

approximately six months later. But that nonetheless passes constitutional muster in light of the fact that the delay in *Biggers* was seven months.

Because at its heart a due process analysis of an out-of-court identification is concerned with fundamental fairness, with the goal of preventing erroneous identification, it bears emphasis that Mr. Pleasant was separately identified as the robber from surveillance photographs by people who were in close contact with him, including his probation officer, the cousin whom he asked to move his vehicle, and the mother of his child.

Defense counsel is correct that there might be questions as to how the lineups were conducted that are relevant, but at this juncture the issues raised are at best speculative. As to the arrays conducted by the FBI, the standard instructions given the witnesses are set forth in the appended reports. As to the simultaneous array used by local authorities, the defense can request an offer of proof as to the instructions given the witnesses. If an insufficient foundation is laid as to any of the arrays, the defense can move to exclude them or strike them at trial, and, at a minimum, cross-examination might cast doubt as to their reliability. But for present purposes, Defendant has not demonstrated a constitutional deficiency.

For these reasons, the Motion to Suppress Out-of-Court Identifications will be denied.

**3)  <u>Defendant's Motion for a Lineup</u>**

Defendant further requests that a pre-trial lineup be conducted. Because the reliability of eyewitness identification is a matter for the jury, a court is under no obligation to conduct a lineup. *United State v. Sebetich,* 776 F.2d 412, 420 (3d Cir. 1985). This motion involves the same considerations relevant to determining whether the out-of-court identifications already conducted were sufficiently reliable. *Id.* at 417–18. Given that I have already concluded that the procedures followed did not create a substantial likelihood of misidentification, due process does

not require that an in person lineup be conducted.  In that regard, an additional eight months have passed, with the result that a lineup would likely prove less reliable than the more contemporaneous exercises already conducted for purposes of identification.  Once again, it bears mention that the identifications by bank employees are far from the only evidence in this case.  Defendant has been definitively identified by three individuals who knew him well; his car was definitively linked to one of the robberies; and physical evidence highly suggestive of guilt was found in his vehicle.  Then there is Mr. Pleasant's post-arrest behavior to consider, which included the request that his cousin have the car towed, and the highly unusual request that his cousin go to his apartment to wash his clothes.[1]  All of that additional evidence weighs against the need to conduct an in-person lineup.  I am further persuaded that it is appropriate for me to consider the additional trauma and inconvenience to victims and witnesses in a case where there is substantial independent evidence against a defendant.

For these reasons, Defendant's Motion for Pretrial Lineup will be denied.

**4) <u>Cross Motions as to Audio Recordings</u>**

The Government's Motion to Admit Audio Recordings will be granted, as will Defendant's Motion to Admit Full Recordings.  At trial, if the Government seeks to play a recording, it shall simultaneously play other portions designated by the defense.

**5) <u>Government's Motion to Admit Evidence under Rule 404(b)</u>**

The Government seeks leave to introduce evidence that, after Mr. Pleasant was arrested, he called his cousin and asked him to go to Defendant's apartment to wash clothing.  The Government further seeks to admit the evidence that Mr. Pleasant called his girlfriend with the request that she further contact his cousin asking him to have Defendant's car towed from the location where he was taken into custody by the FBI.  It further seeks to admit evidence of a

---

[1] Presumably to remove trace evidence, as discussed below.

conversation with his girlfriend that could be interpreted as a request that she change her testimony before the grand jury for the purpose of protecting him.

Although Rule 404(b) places limits on the admission of evidence concerning conduct, there is an exception where the evidence bears upon consciousness of the guilt. *United States v. Gatto,* 995 F. 2d 449, 454 (3d Cir. 1993). Defendant's purpose in seeking to move his car is obvious, and the Government may introduce evidence that he made such a request. Similarly, Defendant's conversation with his girlfriend concerning her grand jury testimony could reasonably be construed to show consciousness of guilt. Finally, although Defendant's request that his cousin wash his clothes is somewhat more obscure given the facts of this case, the Government persuaded me at argument that it reflects Defendant's concern that there might be trace evidence that could link him either to one of the victim bank tellers or to his accomplice in performing the robberies. Particularly given the unusual nature of the request, I agree that a jury could reasonably construe such conduct as demonstrating a consciousness of guilt.

For these reasons, the Government's Motion pursuant to Rule 404(b) will be granted.

### 6) <u>Government's Motion to Admit Evidence under Rule 609</u>

If Mr. Pleasant testifies at trial, the Government seeks leave to impeach him with two prior felony convictions, the 2008 conviction for sale of narcotics, and a 2012 conviction for robbery. Having balanced the probative value of such evidence against its prejudicial effect to Defendant, the Government's motion will be denied.

The Government further seeks leave to cross-examine any character witnesses whom Defendant might call with evidence of these prior convictions. Within the Third Circuit, the proper scope of such a cross-examination of a character witness is controlled by *United States v. Curtis*. 644 F.2d 263, 267–68 (3d Cir. 1981). Under *Curtis,* the relevance of prior convictions is

controlled by the testimony elicited from the witness on direct examination, and therefore the Government's motion is not ripe for resolution at this time. Should the defense present character witnesses at trial, the Government is instructed to seek a ruling at sidebar as to the proper scope of cross-examination before proceeding.

/s/ Gerald Austin McHugh
Gerald Austin McHugh
United States District Judge